# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LENA BRANCH,

    *Plaintiff*,

v.

RICHARD V. SPENCER.,

    *Defendant*.

Civil Action No. 16-1713 (TJK)

## **MEMORANDUM OPINION**

    Lena Branch is a former logistics management specialist for the United States Navy. She alleges that beginning in 2014, her supervisors began mistreating her. The next year, she suffered a stroke, her relationship with her supervisors deteriorated further, and she was suspended for two days. Now Branch has sued the Navy, asserting claims of disability discrimination and retaliation. She claims that her suspension was motivated by her stroke and her complaints about being mistreated.

    Defendant has moved for summary judgment, arguing that Branch's claims are either untimely or unsupported by the record, because no reasonable juror could infer that her supervisors' motives were either discriminatory or retaliatory. The Court agrees, and summary judgment will be entered for Defendant. The Court will also deny Branch's motion to amend her complaint, filed ten months after summary judgment briefing was complete, because permitting Branch to add new claims at such a late stage would prejudice Defendant and unduly expand the scope of the case.[1]

---

[1] In deciding these motions, the Court considered all relevant filings, including but not limited to: ECF No. 3, Plaintiff's Amended Complaint ("Am. Compl."); ECF No. 6, Defendant's Answer; ECF No. 12, Motion to Dismiss Complaint Allegation Paragraphs Without Prejudice; ECF No.

## I. Factual and Procedural Background

### A. Branch's Alleged Mistreatment

The following facts are undisputed unless otherwise noted. Branch began working for the Navy in 2010. Def.'s SOF ¶ 1; Pl.'s SOF ¶¶ 1–4. As of 2014, she worked as a logistics management specialist at pay grade GS-11. Def.'s SOF ¶ 2; Pl.'s SOF ¶ 4. In March 2014, Branch clashed with her supervisor, Lieutenant Commander Jay Gaul, when she denied him access to a space containing classified information because she thought he lacked the security clearance to enter. Def.'s SOF ¶¶ 3, 10–25; Pl.'s SOF ¶¶ 11–15, 18. Branch found Gaul's behavior threatening and discriminatory based on her gender and she reported the incident to Daniel Gardner, who supervised them both. Def.'s SOF ¶¶ 3, 6, 31–33; Pl.'s SOF ¶¶ 5, 8, 19.

Branch also asked Gardner for the contact information for the Equal Employment Opportunity office. *See* Def.'s SOF ¶¶ 27–28, 37–39; Pl.'s SOF ¶¶ 19–21. Branch asserts that she contacted the EEO office in March 2014. Pl.'s SOF ¶ 21; *see also* Am. Compl. ¶ 18 ("Plaintiff subsequently . . . sought an EEO counselor to file an EEO discrimination complaint against Lt. Gaul in March 2014."); ECF No. 20-1 at 5 ("I contacted the EEO office in March 2014 . . . and filed a complaint."). Defendant appears to dispute that Branch did so. *See* ECF No. 23 at 6 (describing Plaintiff's statement that she "engaged in a protected activity by complaining of discrimination to the EEO in March 2014" as a "characterization of the intent of the Navy's SOF and . . . not a fact"). Branch also filed a complaint about the incident with the Navy's inspector general. Def.'s SOF ¶ 102; ECF No. 20-1 at 3.

---

16, Stipulation of Dismissal; ECF No. 20 ("Def.'s Mot."); ECF No. 20, Defendant's Statement of Material Facts as to Which There Exists No Genuine Issue ("Def.'s SOF"); ECF No. 22 ("Pl.'s Opp'n"); ECF No. 22, Plaintiff's Statement of Material Facts ("Pl.'s SOF"); ECF No. 23, Defendant's Reply; ECF No. 24, Plaintiff's Motion to Stay and Motion for Leave to File a Second Amended Complaint ("Pl.'s Mot."); ECF No. 25, Defendant's Memorandum in Opposition; and ECF No. 26, Plaintiff's Reply.

In April 2014, Branch was promoted to supervisory logistics management specialist at pay grade GS-12. Def.'s SOF ¶ 47; Pl.'s SOF ¶ 24. With that promotion, Branch inherited responsibility for a "mobility section," Def.'s SOF ¶ 53, meaning she coordinated the provision of equipment to deploying servicemembers, Def.'s Mot. at 3. The mobility section was in a different building, so in October 2014, Sherry Mellon, Branch's supervisor who had replaced Gaul, asked her to work out of a building that was closer to her new supervisees. Def.'s SOF ¶¶ 60–62. Branch delayed doing so until she was issued a letter of caution for her failure to follow Mellon's instruction. *Id.* ¶¶ 66–67. And when she did move, it did not go smoothly: Mellon and others found Branch hard to get in touch with, and Branch felt that she could not manage her workload while splitting time between two buildings. *Id.* ¶¶ 62–63, 68–70; Pl.'s SOF ¶ 32. According to Branch, in May 2015 she complained to Chief Master Sergeant Kevin Kloeppel, a senior management official, that the move was discriminatory and contributed to a hostile work environment for her. Pl.'s SOF ¶ 32; ECF No. 22-6 ¶¶ 2–3. She also says that, shortly after she met with Kloeppel, she was "immediately questioned [and] summoned by her supervisor Mellon to have a meeting with . . . Gardner." Pl.'s SOF ¶ 32. Following this meeting, she received an email from Gardner on May 13, 2015, that she describes as reprimanding her for speaking with Kloeppel. *Id.* Defendant disputes most of the facts surrounding Branch's meeting with Kloeppel, arguing that nothing in the record suggests that Branch complained to him of discrimination or retaliation, or that she was reprimanded. ECF No. 23 at 8.

B.  **Branch's Stroke**

On June 22, 2015, Branch suffered a stroke and was hospitalized. Pl.'s SOF ¶ 33. She was released from the hospital two days later but remained out of work on doctor's orders for several months. *Id.* ¶¶ 36–37, 40. Shortly after her stroke, Branch's sister called Mellon to

3

inform her that Branch was in the hospital. Def.'s SOF ¶¶ 81–83; Pl.'s SOF ¶ 35. In July, Branch told Mellon herself that she would be out sick for some time. Pl.'s SOF ¶¶ 38–39.

### C. Branch's October 2015 Suspension

On June 10, 2015, less than two weeks before Branch's stroke, Mellon began the process to discipline her for various performance problems. Def.'s SOF ¶ 92.[2] Branch does not dispute this timing. *See* Pl.'s SOF ¶¶ 42–44, 50–54. Branch did not find out about the discipline, however, until a few months later. Def.'s SOF ¶ 96; Pl.'s SOF ¶ 42. More precisely, in late July, Branch's supervisors mailed her a Notice of Proposed 14-Calendar Day Suspension, which she received in August. Def.'s SOF ¶¶ 94–96; Pl.'s SOF ¶ 42. The notice described the reasons for Branch's proposed discipline as delaying in carrying out an assignment, failure to follow instructions, and disrespectful conduct. Def.'s SOF ¶ 94.

The charge for delay in carrying out an assignment was based on two incidents further described in the notice. First, Branch allegedly failed to "develop a draft of the Installation Deployment Plan" by March 23, 2015. ECF No. 20-1 at 113. She received several extensions, until April 7, May 19, May 26, June 1, and June 8, but purportedly failed to complete a draft by any of those dates. *Id.* at 113–14. Second, Branch was tasked with "accomplish[ing] a critical

---

[2] Branch objects to Defendant's inclusion of Exhibit D to its summary judgment motion, which it cites in support of this fact. Pl.'s Opp'n at 1. Exhibit D is an email chain spanning June 10 to June 17, 2015, between Mellon and an employee working in the Navy's Labor and Employee Relations department about bases for disciplining Branch. *See* ECF No. 20-4. Branch's objection to this exhibit in her opposition is based on it not having been "produced during discovery or provided during the EEO investigation." *See* Pl.'s Opp'n at 1. But Branch does not suggest that Defendant *should* have produced Exhibit D during discovery pursuant to one of her requests. Nor has she moved under Federal Rule of Civil Procedure 56(d) to take additional discovery to allow her to rebut or discredit this email chain. Her only option in summary judgment briefing, then, is to present contrary evidence, which she has not done. Finally, Branch "object[ed] to the authentication of the emails," Pl.'s Opp'n at 1, which Defendant addressed by including with its reply a declaration by Holli Dunn attesting to their authenticity and their being "true and accurate copies of the email communications so identified in Exhibit D," ECF No. 23-1 ¶ 3.

analysis project" for a superior by 10:00 a.m. on March 16, 2015, but she allegedly did not send the analysis until 12:06 p.m. *Id.* at 114.

The charge for failure to follow instructions was based on a May 13, 2015 meeting held with Branch "to discuss the proper use of chain of command, reporting procedures, reporting to work, and communication issues." *Id.* But a few weeks later, Branch allegedly did not appear for a meeting with a co-worker, Holli Dunn. *Id.* When Dunn went looking for Branch, she found a sign on Branch's door that did not help her find or contact Branch, which violated the procedures discussed with Branch at the May 13 meeting. *Id.* And Dunn had no way to leave a voice mail for Branch, because Branch had not set up a voice mailbox despite having been told to do so. *Id.*

The charge for disrespectful conduct arose from an incident between Branch and Dunn on June 1, 2015. *Id.* In describing the basis for this charge, Dunn wrote:

> On 1 June 2015, while in your office you had informed me that you could not meet with me on 2 June 2015 due to a scheduled brief with the Vice Commander. I informed you that I was not made aware of that brief, to which you stated that you did not need to tell me about it. I informed you that that was not correct and as the Deputy Site Director, I am responsible for the operations of the Organization and reminded you of your chain of command. I informed you that you needed to brief Ms. Mellon that afternoon on the information that you were going to present to the Installation Commander. You informed me that you didn't need to do that. I was going to say, "Lena, we need to go over the material so we know what's going to be briefed and make sure you are prepared," however, all I was able to say was "Lena" and you immediately cut me off and said, "Holli" in a very disrespectful manner while taking an aggressive stance.

*Id.* at 114–15.

After receiving the notice in the mail, Branch contacted the EEO office on August 17, 2015, to file a complaint about the proposed suspension. Def.'s SOF ¶ 41; Pl.'s SOF ¶ 45. In late August, Gardner began considering whether to issue the proposed discipline, and in

5

September he opted to suspend her for two days. Def.'s SOF ¶¶ 97–98; Pl.'s SOF ¶¶ 50–53. Branch served the suspension on October 5 and 6, 2015. Def.'s SOF ¶ 98; Pl.'s SOF ¶ 53.

In December 2015, Branch completed a formal complaint about the suspension. Def.'s SOF ¶ 43. In it, she alleged disability discrimination based on "a serious neurological disability that substantially impair[ed] [her] mental and physical activities," and retaliation based on (1) her having "filed an [inspector general] and EEO complaint for harassment against a commander" in March 2014 and (2) "an [inspector general] and [Department of Defense] Whistle blower Complaint" in March 2015. ECF No. 20-1 at 3. She alleged acts of discrimination and retaliation against her, including the March 2014 incident with Gaul, Gardner's assignment of responsibility for the mobility section to her, and her October 2015 suspension.

In August 2016, Mellon suspended Branch for ten days. *See* ECF No. 24-1 at 3. The basis for this suspension is not in the record. *Id.* In April 2017, Mellon proposed terminating Branch's employment. *Id.* In August 2017, after Branch filed a formal EEO complaint about these actions, the EEO office began investigating them. *Id.* at 1.

### D. This Action

Branch filed this suit in August 2016 and amended her complaint shortly afterward. ECF Nos. 1, 3. In her amended complaint, she brought four claims: (1) a disparate-treatment claim in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*; (2) a retaliation claim in violation of the Rehabilitation Act; (3) a hostile work environment claim in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and (4) a retaliation claim in violation of Title VII. Am. Compl. ¶¶ 37–48. Branch later voluntarily dismissed two aspects of her complaint: the allegations about her suspension for ten days in August 2016, *see* ECF Nos. 11, 13, and her hostile work environment claim, *see* ECF No. 16.

Defendant moved to dismiss part of Branch's complaint and for summary judgment on all claims. *See* Def.'s Mot. Defendant argues that Branch failed to timely exhaust her claims arising from any conduct before July 2015 and that no reasonable jury could find that any conduct afterward stemmed from a discriminatory or retaliatory motive. *Id.* at 14, 18, 20. Branch conceded the first argument in her opposition, Pl.'s Opp'n at 11, but disputes the second.

Nearly a year after briefing was complete, Branch moved to amend her complaint a second time. *See* Pl.'s Mot. She asserted that the EEO office had finished investigating her August 2016 suspension and her April 2017 termination. *Id.* at 2. She therefore requested leave to add claims arising from these incidents to her complaint. *Id.* Defendant opposed the motion on the grounds that Branch unduly delayed in bringing the motion and that the amendment would prejudice Defendant by allowing her to cure various defects identified in Defendant's summary judgment motion. ECF No. 25 at 2–5.

## II.  Legal Standard

When a party moves for summary judgment, the Court must grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering whether to grant summary judgment, the Court "view[s] the evidence in the light most favorable to the non-movants and draw[s] all reasonable inferences accordingly." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). Even with this favorable interpretation of the evidence, though, the non-movant must create more than "*some* alleged factual dispute." *Id.* If the movant carries its burden to show that there is no genuine issue of material fact, then "the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017).

When a plaintiff moves for leave to amend her complaint after her time to do so as of right has expired, she may do so "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id*. Whether "to grant or deny leave to amend, however, is vested in the sound discretion of the trial court." *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977). Generally, courts deny leave to amend only for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## III. Analysis

### A. Defendant's Motion for Summary Judgment

As described above, Branch's complaint now includes one disability-discrimination claim under the Rehabilitation Act and two retaliation claims—one under the Rehabilitation Act and one under Title VII. The Court will address Defendant's motion as to her discrimination claim first and then address the two retaliation claims together. *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1165–66 (D.C. Cir. 2010) (same legal standards apply to retaliation claims under the Rehabilitation Act and Title VII).

#### 1. Branch's Discrimination Claim

The Rehabilitation Act prohibits employers from discriminating against an employee because of the employee's disability. *See* 42 U.S.C. § 12112(a); *Woodruff v. Peters*, 482 F.3d 521, 526–27 (D.C. Cir. 2007). The "two essential elements" of a disability-discrimination claim "are that (i) the plaintiff suffered an adverse employment action (ii) *because of* the plaintiff's . . . disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (emphasis added). When a plaintiff provides only "circumstantial evidence" of discriminatory motive by her

8

employer, courts employ "the burden shifting framework of" *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–08 (1973). *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014); *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). Under this burden-shifting framework, whenever an employer comes forth with "a legitimate, nondiscriminatory reason" for its treatment of the plaintiff, courts must inquire "whether the plaintiff [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason *and* that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi*, 525 F.3d at 1226 (emphasis added).

Branch asserts that she was suspended for two days in October 2015 because of her disability,[3] and Defendant has offered the various legitimate, nondiscriminatory reasons for the suspension described above. But Branch has not responded by producing evidence to show that disability discrimination caused her suspension, even assuming it was an adverse employment action and that she was in fact disabled. She has no direct evidence of disability discrimination and appears to reply solely on the timing of events. But the problem for Branch is that her suspension was in the works *before* she suffered her stroke. Mellon first consulted with the human resources department about proposing discipline for Branch on June 10, 2015. Def.'s SOF ¶ 92. Branch suffered her stroke twelve days later. Pl.'s SOF ¶ 33. Although Branch did not find out about the possibility that she would be suspended until August, Pl.'s SOF ¶ 42, she does not dispute that Mellon and other officials had begun planning it before her stroke. And Defendant's explanations for the proposed discipline were consistent both before Branch

---

[3] Branch complains about other actions taken by Defendant, but the remainder occurred before her stroke. As a result, she does not—and cannot—argue that they were motivated by discrimination based on her disability.

suffered her disability and afterward. *Compare* ECF No. 22-10 (June 10, 2015 email suggesting discipline) *with* ECF No. 20-1 at 113–15 (notice of proposed discipline).

Even drawing all reasonable inferences in Branch's favor, on this record that ends the matter. When an employer contemplates an adverse employment action against an employee *before* the employee suffers a disability, an inference that disability discrimination caused the action does not arise if the action happens to be implemented *after* the employee becomes disabled. *See Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001). In *Breeden*, the Supreme Court emphasized that "previously planned" employment actions are not suspect when an employee develops a protected characteristic later, and employers "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id.* Under that theory, courts in this district "have routinely rejected any 'inference of causation' when 'the adverse action being challenged is the result of a nondiscriminatory process that began before the protected conduct.'" *Salak v. Pruitt*, 277 F. Supp. 3d 11, 27–28 (D.D.C. 2017) (collecting cases); *see also Furey v. Mnuchin*, 334 F. Supp. 3d 148, 167 (D.D.C. 2018); *Saunders v. McMahon*, 300 F. Supp. 3d 211, 227 (D.D.C. 2018); *Craig v. Mnuchin*, 278 F. Supp. 3d 42, 64–65 (D.D.C. 2017). This Court will follow suit. The undisputed facts show that Mellon and Dunn began the process of disciplining Branch before she became disabled. Her later suspension thus does not support an inference of causation, and Branch offers no other evidence that disability discrimination caused her suspension. For these reasons, Defendant is entitled to judgment as a matter of law on Branch's disability-discrimination claim.

### 2. Branch's Retaliation Claims

Both the Rehabilitation Act and Title VII prohibit employers from retaliating against employees who have opposed discrimination or "made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under" one of the statutes. 42 U.S.C. §§ 12203(a), 2000e-3(a). Because the provisions are so similar, courts use the same standards to analyze retaliation claims under both statutes. *Mogenhan*, 613 F.3d at 1166. To make out a retaliation claim under either statute, "the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198.[4]

In identifying the underlying protected activity that motivated Defendant's retaliation against her, Branch focuses only on her May 2015 complaint to Kloeppel.[5] Defendant argues that her contact with Kloeppel cannot have been protected activity, because it "was a general complaint, and not one protected by Title VII or the Rehabilitation Act." Def.'s Reply at 15–16 (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)). Defendant cites to Branch's "declaration during the EEO investigation that she discussed with CMSgt Kloeppel the

---

[4] Defendant argues that Branch failed to properly exhaust her administrative remedies for any of the allegedly materially adverse actions, Def.'s Mot at 14–16, and argues that the Court should dismiss Branch's claims on that basis under Federal Rule of Civil Procedure 12(b)(1). *See* Def.'s Mot. at 11 ("Unlike Title VII claims, exhaustion of administrative remedies is a jurisdictional requirement for Rehabilitation Act claims."). The Court declines to do so. First, Defendant is only half-correct about exhaustion being jurisdictional under the Rehabilitation Act. A plaintiff must have filed an administrative complaint at some point about a particular incident, or else a court lacks jurisdiction over any Rehabilitation Act claim based on that incident. *See Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006). But the 45-day requirement, which comes from a regulation and not from the Rehabilitation Act, is not jurisdictional. *Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015). Whether Branch complied with the 45-day requirement is thus non-jurisdictional. Second, as the Court explains below, Branch's claims fail, even if they had been properly exhausted.

[5] In her briefing, Branch never argues that Mellon, Gardner, or Dunn knew of her purported March 2014 contact with the EEO office about her run-in with Gaul. See Pl.'s Opp'n at 16–20; see also Pl.'s SOF ¶¶ 47–49 (not disputing Defendant's assertions that Mellon, Gardner, and Dunn first learned of her EEO activity in August 2015). Because she limits her argument to her May 2015 contact with Kloeppel, the Court does not consider a claim based on any other purported protected activity.

11

fact that she believed she was doing two jobs." *Id.* at 15. For her part, Branch declares that she discussed "discrimination" and her "hostile work environment" with Kloeppel, although she never specifies the type of discrimination she alleged and, as she describes it, the meeting focused on her supervisors' request that she move buildings. ECF No. 22-6 ¶ 2.

On this record, the Court agrees with Defendant as to Branch's claim under the Rehabilitation Act; the record does not support Branch's claim that she engaged in protected activity under that statute when she reached out to Kloeppel. Protected activity under the Rehabilitation Act, of course, must involve reporting discrimination based on a disability, and in May 2015, Branch had not yet suffered the stroke that allegedly caused her disability. So her claim for retaliation under the Rehabilitation Act fails for this reason alone.

Whether Branch engaged in protected activity under Title VII is a closer question, given that Kloeppel was not an EEO official and the record does not reflect the nature of any discrimination she asserts she alleged. The Court assumes, without deciding, that she did. But even so, her Title VII retaliation claim fails because a reasonable jury could not conclude that retaliatory animus for protected activity under Title VII caused her suspension later that year.

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims in the same way that it does to discrimination claims. *Woodruff*, 482 F.3d at 528. As discussed above, that means that once a defendant has "articulate[d] some legitimate, non-retaliatory reason for the adverse action," "the plaintiff must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation].'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)) (alteration in original). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant

12

intentionally [retaliated] against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (first alteration in original) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Branch argues that Defendant retaliated against her by suspending her in October 2015. Defendant's proffered legitimate, non-retaliatory reasons for the suspension are set forth in the notice of her proposed discipline: her alleged (1) delay in carrying out an assignment, based on her failure in March 2015 to develop an Installation Deployment Plan and complete a "critical analysis project" on deadline; (2) failure to follow instructions, based on her unexcused absence from a meeting and Dunn's inability to find her in May 2015; and (3) disrespectful conduct, based on the incident in June 2015 when she cut off Dunn "in a disrespectful manner while taking an aggressive stance." ECF No. 20-1 at 113–15. Branch points to various parts of the record that, she argues, show these reasons were pretextual and that her suspension was retaliatory based on protected activity under Title VII. But none of them, separately or together, create a triable issue on this point.

First, she argues that Mellon and Gardner were unhappy that she had complained to Kloeppel about her working conditions. As proof, she asserts that later that month, she was reprimanded about it by Gardner in an email. Pl.'s Opp'n at 15. But the email says no such thing. The email merely memorializes an in-person discussion between Gardner, Mellon, and Branch about the "proper use of the chain of command" and the "proper reporting procedures," as well as other issues (such as reporting to work and communication with her supervisors) that the record reflects were longstanding points of friction between Branch and her supervisors. *See* ECF No. 22-10 (capitalization altered). On its face, the email does not mention Branch's meeting with Kloeppel or reprimand her in any way. And even assuming that it was motivated,

at least in part, by her contact with Kloppel, Branch does not argue that the email was unwarranted because her meeting with Kloeppel was in fact the proper way for her to lodge complaints against her supervisors. Finally, it is farfetched to infer that Mellon and Gardner would have even understood Branch to have engaged in protected activity under Title VII by meeting with Kloeppel. He was, after all, not an EEO official, and Branch described their meeting as focusing on her complaint that her supervisors had required her to move buildings. Ultimately, there is no evidence in the record—other than her invocation of the word "discrimination" in a declaration filed years later in this case—that she described discrimination cognizable under Title VII to Kloeppel, or that her supervisors would have understood that meeting to be protected activity under Title VII. Especially on a record where Branch does not contest any of the factual bases for her suspension, as discussed further below, this email hardly creates an inference of retaliatory animus under Title VII linked to that suspension, even viewed in the most favorable light to Branch. *See Adeyemi*, 525 F.3d at 1226.

Second, Branch argues that her suspension for calling Dunn by her first name was retaliatory because other employees—who were not disciplined—did so as well. *Id.* at 18. But this argument ignores key details in the notice Branch received that make clear that the conduct for which she was suspended was broader than that: Branch failed to tell Dunn important information, then, during a discussion about the matter, cut her off disrespectfully and took an "aggressive stance." ECF No. 20-1 at 115. Branch does not dispute those facts; all she does is posit that using Dunn's first name by itself was not a discipline-worthy offense. Maybe so, but that was not the core of the offense charged. And nowhere does Branch try to rebut or negate any of the other facts that supported her suspension. She does not assert, for example, that she

*had* turned in her assignments on time, or she *had* followed the instructions to make sure her co-workers could find her.[6]

Third, Branch argues that various procedural irregularities suggest that her suspension was retaliation for her meeting with Kloeppel. She asserts that Dunn's assistance helping Mellon draft the proposed discipline was suspicious, because Dunn was not her supervisor. Pl.'s Opp'n at 17–18. She also claims that Gardner, by consulting Mellon before approving her suspension, became tainted by Mellon's retaliatory motive. *Id.* at 19–20. But these arguments fall flat. Although an employer deviating from its normal process for personnel actions may be probative of improper motive, *see Lane v. Vasquez*, 961 F. Supp. 2d 55, 67 (D.D.C. 2013), Branch points to no custom or policy that Mellon, Dunn, and Gardner's consultation violated. The record supports an unremarkable reason for Dunn's involvement: two of the charges were based on incidents involving only Branch and Dunn. Similarly, it makes sense that a higher-level supervisor (Gardner) consulted with an employee's more immediate supervisor (Mellon) before issuing discipline where the latter was more familiar with the employee's alleged misconduct.

For all these reasons, the Court finds that Branch cannot carry her "ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against" her because she

---

[6] Branch does point to her satisfactory performance ratings and her receipt of small cash awards in April 2015 and December 2015, which she says undercut the notion that her performance needed any correction through discipline. Pl.'s Opp'n at 17; ECF No. 22-3 at 2, 4. This argument carries little weight. Her ratings and awards may well speak to the broader picture of her job performance, but they say little about the specific incidents for which her supervisors concluded discipline was warranted. *See Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (finding that a similar argument "offered no grounds for a rational juror to conclude that the reason [the plaintiff] was fired was racial discrimination rather than poor performance").

engaged in protected activity. *Burdine*, 450 U.S. at 253. Defendant is therefore entitled to summary judgment on her retaliation claims as well.

### B. Plaintiff's Motion to Amend

Ten months after the parties finished briefing Defendant's summary judgment motion, Branch moved to amend her complaint to include her August 2016 suspension and her April 2017 termination. *See* Pl.'s Mot; ECF No. 26-1. Although the April 2017 termination happened after Branch filed this lawsuit, she did not move to add that claim under Federal Rule of Civil Procedure 15(d), which permits plaintiffs to supplement their pleadings with "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Rather, she moved to add both new claims under Rule 15(a)(2), which allows the Court to permit amendment "when justice so requires." And because Rule 15(d) allows a plaintiff to supplement its pleadings only "[o]n motion and reasonable notice," the Court will proceed under Rule 15(a)(2) only.

Generally, Rule 15(a)(2) should "be construed liberally" to permit a plaintiff to amend her complaint, unless there is a good reason to deny her that leave. *Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006). Good reasons include "undue delay, bad faith or dilatory motive on the part of the movant, . . . [or] undue prejudice to the opposing party." *Id.* (alteration in original) (quoting *Foman*, 371 U.S. at 182). Additionally, courts may deny amendment where the new claims would be time-barred. *United States v. Hicks*, 283 F.3d 380, 387 (D.C. Cir. 2002). "In limited circumstances, Rule 15(c) saves an otherwise untimely amendment by deeming it to 'relate back' to the timely-filed claims the plaintiff alleged in the original complaint." *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009). But the D.C. Circuit "has

held that employment-discrimination claims based on different discrete adverse actions do not relate back." *Ransom v. Shulkin*, 719 F. App'x 8, 10 (D.C. Cir. 2018).

Branch seeks to add new discrete adverse actions to her complaint, so her claims do not relate back. Defendant, in its opposition to Branch's motion to amend, suggests that her proposed new claims may be time-barred. ECF No. 25 at 1 n.1, 4–5. Branch does not address their timeliness in her reply in support of her motion, nor does she include any facts at all about when, if ever, the EEO finished investigating the incidents underlying her proposed additional claims or sent her a right-to-sue letter. *See* ECF No. 26.

If Branch's proposed additional claims were untimely, the Court would deny her leave to amend on that basis since they do not relate back to her original complaint. *See Hicks*, 283 F.3d at 387. But even assuming they are timely, the Court will still deny her leave to amend at this late stage in the case. Discovery was closed and summary judgment briefing long complete when she filed her motion. Permitting Branch to amend would, as Defendant points out, allow her to address deficiencies in her claims and arguments that Defendant identified in its briefing. ECF No. 25 at 4. Further, allowing Branch to add discrete adverse acts that happened more than a year after the September 2015 suspension on which this case currently turns would require considerably more discovery and a new round of summary judgment briefing. At bottom, her proposed new claims would "improperly expand[] the case to encompass new times and types of allegations." *Ransom*, 719 F. App'x at 10. The Court, in its discretion, will thus deny Branch's motion to amend her complaint. The timeliness of her new claims may be addressed on a fuller record in a later action, if Branch chooses to file one.

## IV. Conclusion

For all the above reasons, the Court will grant Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 20, and deny Plaintiff's Motion to Stay and Motion for Leave to File Second Amended Complaint, ECF No. 24. A separate order will issue.

/s/ Timothy J. Kelly<br>
TIMOTHY J. KELLY<br>
United States District Judge

Date: September 10, 2019